| DISTRICT COURT, **PUEBLO COUNTY, COLORADO** | |
|---|---|
| Pueblo County Combined Courts<br>501 N. Elizabeth Street<br>Pueblo, CO 81003<br>(719) 404-8700 | ▲ COURT USE ONLY ▲ |

**DISTRICT COURT,**
**PUEBLO COUNTY, COLORADO**

Pueblo County Combined Courts
501 N. Elizabeth Street
Pueblo, CO 81003
(719) 404-8700

▲ COURT USE ONLY ▲

Plaintiffs:

  K.M., by and through his next friends, J.M. and B.J.M.;
  J.M., individually;
  B.J.M., individually;
  M.F., by and through her next friend, W.F.;
  W.F., individually;
  J.S., by and through his next friends, C.S. and F.S.;
  C.S., individually;
  F.S., individually;
  S.K., by and through her next friend, THE ARC OF PUEBLO;
  R.W., by and through her next friend, THE ARC OF PUEBLO;
  K.S., by and through her next friend, THE ARC OF PUEBLO;
  E.P., by and through his next friend, THE ARC OF PUEBLO;
  D.M., by and through her next friend, THE ARC OF PUEBLO;
  R.L., by and through his next friend, THE ARC OF PUEBLO;
  C.H., by and through his next friend, THE ARC OF PUEBLO;
  D.S., by and through his next friend, THE ARC OF PUEBLO;
  R.P., by and through his next friend, THE ARC OF PUEBLO;
  L.V., by and through her next friend, THE ARC OF PUEBLO;
  W.S., by and through his next friend, THE ARC OF PUEBLO;
  T.J.S., by and through his next friend, THE ARC OF PUEBLO;
  B.C., by and through her next friend, THE ARC PIKES PEAK REGION;
  P.B., by and through her next friend, THE ARC PIKES PEAK REGION; and
  ESTATE OF B.B., by and through its personal representative, THE ARC OF
  PUEBLO,

  v.

Defendants:

  JOHN W. HICKENLOOPER, JR., in his official capacity as Governor of
  Colorado;
  COLORADO DEPARTMENT OF HUMAN SERVICES;
  REGGIE BICHA;
  NIKKI HATCH;
  VICKI MANLEY;

Case Number:

Division:

SARAH AURICH;
TRACY MYSZAK;
LAURA DEVRIES;
JENNIFER BURKE;
MICHELLE OHNEMUS;
MARIT MELAND;
ISAAC LAWAL;
SARAH LIPPE;
KRISTIE PALUCH;
CARLA JUAREZ;
TONY GHERARDINI; and
JOHN & JANE DOES 1-10,

Attorney for Plaintiffs:

Mari Newman # 30192
Darold W. Killmer # 16056
Michael Fairhurst # 45987
1543 Champa Street Suite 400
Denver, CO 80202
Phone: 303-571-1000
Fax No.: 303-571-1001
mnewman@kln-law.com
dkillmer@kln-law.com
mfairhurst@kln-law.com

## COMPLAINT AND JURY DEMAND

Plaintiffs, by and through their attorneys, Mari Newman, Darold W. Killmer, and

Michael P. Fairhurst of KILLMER LANE & NEWMAN, LLP, and James M. Croshal of James M.

Croshal Attorney at Law, respectfully allege for their Complaint and Jury Demand as follows:

## I.      INTRODUCTION

1.      Defendant Colorado Department of Human Services has a duty to serve and

protect the people with intellectual and developmental disabilities who reside at Pueblo Regional

Center ("PRC") in Pueblo, Colorado. But in late March of 2015, precisely the opposite scenario

unfolded when several Defendant agents of Colorado Department of Human Services ("CDHS")

deliberately disregarded the privacy, dignity, and legal rights of scores of Pueblo Regional Center residents, including the named Plaintiffs.

2.      On or about March 25, 2015, Division Director for Regional Center Operations Defendant Tracy Myszak directed nearly a dozen of her subordinate Defendants at CDHS to storm into the Pueblo Regional Center without notice and conduct warrantless, nonconsensual strip searches of most or all of the residents, including hands-on genital contact in many cases.

3.      According to Myszak's reports to the Colorado Department of Public Health and Environment ("CDPHE"), the strip searches were motivated by vague, stale, and anecdotal suspicions that a *few* PRC residents who resided in one of the several group homes may have been abused *months* earlier.

4.      By late March 2015, there was no time-sensitive or emergent need to forcibly strip search anyone at Pueblo Regional Center – much less the *dozens* of residents there who resided in *ten separate* group homes.

5.      Even if the residents had been given the opportunity to refuse or consent to these illegal searches – which they were not – most of the residents were legally incompetent to consent, and Defendant CDHS and its Defendant agents never sought or received consent from their legal guardians.

6.      These compulsory, unlawful strip searches and the associated nonconsensual genital contact foreseeably caused profound distress to the victims who were strip searched, many of whom have histories of physical and sexual abuse, and all of whom are particularly vulnerable to suffering deleterious effects from such a brazen exploitation of power.

## II.      JURISDICTION AND VENUE

7.      At all pertinent times, all the Plaintiffs were citizens of the United States and

residents of and domiciled in Colorado. Defendants' challenged strip searches which caused Plaintiffs' injuries all occurred in Pueblo County, Colorado.

8.     Plaintiffs are all "persons" as defined by Colo. Rev. Stat. § 24-72-302(9).

9.     Venue is proper in this Court pursuant to Colo. R. Civ. P. 98(c) because all of the events central to Plaintiffs' legal claims occurred within the County of Pueblo.

10.     This Court has jurisdiction over the claims asserted herein pursuant to Colo. Rev. Stat. § 13-1-124, 42 U.S.C. § 1983, 42 U.S.C. § 12132, *et seq.*, 29 U.S.C. § 701, *et seq.*, 42 U.S.C. § 1988, and other applicable law.

### III.     PARTIES

#### A. Plaintiffs:

11.     Plaintiff K.M. sues here by and through his next friends and guardians, J.M. and B.J.M. At all relevant times, K.M. was a citizen of the United States and a resident of and domiciled in the State of Colorado. K.M. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case. All Defendants were on notice that J.M. and B.J.M. were the court-appointed legal guardians for K.M. at all relevant times.

12.     At all relevant times, Plaintiff J.M. was a court-appointed legal guardian for his son, K.M. Plaintiff J.M. asserts a claim on behalf of himself in addition to K.M. based on Defendants' unlawful interference with his constitutional right to direct and control the health and welfare-related care of his son, K.M. Plaintiff J.M. is a legal guardian of J.M. as of the filing date of this Complaint.

13.     At all relevant times, Plaintiff B.J.M. was a court-appointed legal guardian for her son, K.M. Plaintiff B.J.M. asserts a claim on behalf of herself in addition to K.M. based on Defendants' unlawful interference with her constitutional right to direct and control the health

and welfare-related care of her son, K.M. Plaintiff B.J.M. is a legal guardian of J.M. as of the filing date of this Complaint.

14.     Plaintiff M.F. sues here by and through her next friend and guardian, W.F. At all relevant times, M.F. was a citizen of the United States and a resident of and domiciled in the State of Colorado. M.F. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case. All Defendants were on notice that W.F. was the court-appointed legal guardian for M.F. at all relevant times.

15.     At all relevant times, Plaintiff W.F. was the court-appointed legal guardian for her sister, M.F. Plaintiff W.F. asserts a claim on behalf of herself in addition to M.F. based on Defendants' unlawful interference with her constitutional right to direct and control the health and welfare-related care of M.F., her sister. At all relevant times, W.F. exercised *in loco parentis* authority and control over the health and welfare-related care of M.F. Plaintiff W.F. is the legal guardian of M.F. as of the filing date of this Complaint.

16.     Plaintiff J.S. sues here by and through his next friends and guardians, C.S. and F.S. At all relevant times, J.S. was a citizen of the United States and a resident of and domiciled in the State of Colorado. J.S. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case. All Defendants were on notice that C.S. and F.S. were the court-appointed legal guardians for J.S. at all relevant times.

17.     At all relevant times, Plaintiff C.S. was a court-appointed legal guardian for her son, J.S. Plaintiff C.S. asserts a claim on behalf of herself in addition to J.S. based on Defendants' unlawful interference with her constitutional right to direct and control the health and welfare-related care of her son, J.S. Plaintiff C.S. is a legal guardian of J.S. as of the filing date of this Complaint.

5

18. At all relevant times, Plaintiff F.S. was a court-appointed legal guardian for his son, J.S. Plaintiff F.S. asserts a claim on behalf of himself in addition to J.S. based on Defendants' unlawful interference with his constitutional right to direct and control the health and welfare-related care of his son, J.S. Plaintiff F.S. is a legal guardian of J.S. as of the filing date of this Complaint.

19. Plaintiff S.K. sues here by and through her next friend and guardian, The Arc of Pueblo. At all relevant times, S.K was a citizen of the United States and a resident of and domiciled in the State of Colorado. S.K. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case.

20. Plaintiff R.W. sues here by and through her next friend and guardian, The Arc of Pueblo. At all relevant times, R.W. was a citizen of the United States and a resident of and domiciled in the State of Colorado. R.W. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case.

21. Plaintiff K.S. sues here by and through her next friend and guardian, The Arc of Pueblo. At all relevant times, K.S. was a citizen of the United States and a resident of and domiciled in the State of Colorado. K.S. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case.

22. Plaintiff E.P. sues here by and through his next friend and guardian, The Arc of Pueblo. At all relevant times, E.P. was a citizen of the United States and a resident of and domiciled in the State of Colorado. E.P. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case. All Defendants were on notice that Arc of Pueblo was the court-appointed legal guardian for E.P. at all relevant times.

23. Plaintiff D.M. sues here by and through her next friend and guardian, The Arc of

Pueblo. At all relevant times, D.M. was a citizen of the United States and a resident of and domiciled in the State of Colorado. D.M. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case. All Defendants were on notice that Arc of Pueblo was the court-appointed legal guardian for D.M. at all relevant times.

24.     Plaintiff R.L. sues here by and through his next friend and guardian, The Arc of Pueblo. At all relevant times, R.L. was a citizen of the United States and a resident of and domiciled in the State of Colorado. R.L. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case. All Defendants were on notice that Arc of Pueblo was the court-appointed legal guardian for R.L. at all relevant times.

25.     Plaintiff C.H. sues here by and through his next friend and guardian, The Arc of Pueblo. At all relevant times, C.H. was a citizen of the United States and a resident of and domiciled in the State of Colorado. C.H. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case. All Defendants were on notice that Arc of Pueblo was the court-appointed legal guardian for C.H. at all relevant times.

26.     Plaintiff D.S. sues here by and through his next friend and guardian, The Arc of Pueblo. At all relevant times, D.S. was a citizen of the United States and a resident of and domiciled in the State of Colorado. D.S. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case.

27.     Plaintiff R.P. sues here by and through his next friend and guardian, The Arc of Pueblo. At all relevant times, R.P. was a citizen of the United States and a resident of and domiciled in the State of Colorado. R.P. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case.

28.     Plaintiff L.V. sues here by and through her next friend and guardian, The Arc of

Pueblo. At all relevant times, L.V. was a citizen of the United States and a resident of and domiciled in the State of Colorado. L.V. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case.

29.     Plaintiff W.S. sues here by and through his next friend and guardian, The Arc of Pueblo. At all relevant times, W.S. was a citizen of the United States and a resident of and domiciled in the State of Colorado. W.S. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case.

30.     Plaintiff T.J.S. sues here by and through his next friend and guardian, The Arc of Pueblo. At all relevant times, T.J.S. was a citizen of the United States and a resident of and domiciled in the State of Colorado. T.J.S. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case.

31.     Plaintiff B.C. sues here by and through her next friend and guardian, The Arc Pikes Peak Region. At all relevant times, B.C. was a citizen of the United States and a resident of and domiciled in the State of Colorado. B.C. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case. All Defendants were on notice that The Arc Pikes Peak Region was the court-appointed legal guardian for B.C. at all relevant times.

32.     Plaintiff P.B. sues here by and through her next friend and guardian, The Arc Pikes Peak Region. At all relevant times, P.B. was a citizen of the United States and a resident of and domiciled in the State of Colorado. P.B. was one of the PRC residents Defendants subjected to a nonconsensual strip search during the events underlying this case. All Defendants were on notice that The Arc Pikes Peak Region was the court-appointed legal guardian for P.B. at all relevant times.

33.     Plaintiff Estate of B.B. sues here by and through its personal representative, The

Arc of Pueblo. At all relevant times, B.B. (now deceased) was a citizen of and domiciled in the

State of the United States and a resident of Colorado. B.B. was one of the PRC residents

Defendants subjected to a nonconsensual strip search during the events underlying this case. All

Defendants were on notice that Arc of Pueblo was the court-appointed legal guardian for B.B. at

all relevant times.

34.     The Plaintiffs in this case are sometimes referred to herein collectively as

"Plaintiffs" or "residents."

### B. **Defendants**:

35.     Defendant John W. Hickenlooper, Jr. is the Governor of the State of Colorado. In

his official capacity, Governor Hickenlooper is the chief executive officer of the State of

Colorado. It is his responsibility to ensure that the laws of the State are properly enforced.

COLO. CONST. art. IV, § 2. Governor Hickenlooper is a person with the meaning of 42 U.S.C.

§ 1983 and was acting under color of state law at all times relevant to this Complaint. Governor

Hickenlooper's official residence is in the City and County of Denver, Colorado.

36.     At all relevant times to the subject matter of this litigation, Defendant Colorado

Department of Human Services employed the individual Defendants sued herein. At all relevant

times to the subject matter of this litigation, Defendant CDHS was responsible for the training,

supervision, and discipline of its employees, and for its policies, customs, and actual practices

challenged herein. Defendant CDHS is an agency of the State of Colorado.

37.     At all times relevant to the subject matter of this litigation, Defendant Reggie

Bicha was a citizen of the United States and a resident of and domiciled in the State of Colorado.

At all relevant times, Defendant Bicha was acting under color of state law in his capacity as

9

CDHS Executive Director.

38.     At all times relevant to the subject matter of this litigation, Defendant Nikki Hatch was a citizen of the United States and a resident of and domiciled in the State of Colorado. At all relevant times, Defendant Hatch was acting under color of state law in her capacity as CDHS Deputy Executive Director of Operations.

39.     At all times relevant to the subject matter of this litigation, Defendant Viki Manley was a citizen of the United States and a resident of and domiciled in the State of Colorado. At all relevant times, Defendant Manley was acting under color of state law in her capacity as CDHS Director of Community Access and Independence.

40.     At all times relevant to the subject matter of this litigation, Defendant Sarah Aurich was a citizen of the United States and a resident of and domiciled in the State of Colorado. At all relevant times, Defendant Aurich was acting under color of state law in her capacity as a CDHS Deputy Director for Defendant Manley.

41.     At all times relevant to the subject matter of this litigation, Defendant Tracy Myszak was a citizen of the United States and a resident of and domiciled in the State of Colorado. At all relevant times, Defendant Myszak was acting under color of state law in her capacity as CDHS Division Director for Regional Center Operations.

42.     At all times relevant to the subject matter of this litigation, Defendant Laura Devries was a citizen of the United States and a resident of and domiciled in the State of Colorado. At all relevant times, Defendant Devries was acting under color of state law in her capacity as an agent of CDHS based out of its Wheat Ridge Regional Center facility.

43.     At all times relevant to the subject matter of this litigation, Defendant Jennifer Burke was a citizen of the United States and a resident of and domiciled in the State of Colorado.

At all relevant times, Defendant Burke was acting under color of state law in her capacity as an agent of CDHS based out of its Wheat Ridge Regional Center facility.

44.    At all times relevant to the subject matter of this litigation, Defendant Nurse Michelle Ohnemus, RN, was a citizen of the United States and a resident of and domiciled in the State of Colorado. At all relevant times, Defendant Ohnemus was acting under color of state law in her capacity as an agent of CDHS based out of its Wheat Ridge Regional Center facility.

45.    At all times relevant to the subject matter of this litigation, Defendant Marit Meland was a citizen of the United States and a resident of and domiciled in the State of Colorado. At all relevant times, Defendant Meland was acting under color of state law in her capacity as an agent of CDHS based out of its Wheat Ridge Regional Center facility.

46.    At all times relevant to the subject matter of this litigation, Defendant Nurse Isaac Lawal, RN, was a citizen of the United States and a resident of and domiciled in the State of Colorado. At all relevant times, Defendant Lawal was acting under color of state law in his capacity as an agent of CDHS based out of its Wheat Ridge Regional Center facility.

47.    At all times relevant to the subject matter of this litigation, Defendant Sarah Lippe was a citizen of the United States and a resident of and domiciled in the State of Colorado. At all relevant times, Defendant Lippe was acting under color of state law in her capacity as an agent of CDHS based out of its Wheat Ridge Regional Center facility.

48.    At all times relevant to the subject matter of this litigation, Defendant Kristie Paluch was a citizen of the United States and a resident of and domiciled in the State of Colorado. At all relevant times, Defendant Paluch was acting under color of state law in her capacity as an agent of CDHS based out of its Wheat Ridge Regional Center facility.

49.    At all times relevant to the subject matter of this litigation, Defendant Carla

Juarez was a citizen of the United States and a resident of and domiciled in the State of Colorado. At all relevant times, Defendant Juarez was acting under color of state law in her capacity as an agent of CDHS based out of its Wheat Ridge Regional Center facility.

50.     At all times relevant to the subject matter of this litigation, Defendant Tony Gheradini was a citizen of the United States and a resident of and domiciled in the State of Colorado. At all relevant times, Defendant Gheradini was acting under color of state law in his capacity as an emergency manager for CDHS.

51.     At all times relevant to the subject matter of this litigation, Defendants John and Jane Does 1-10 were citizens of the United States and residents of and domiciled in the State of Colorado. John and Jane Doe Defendants 1-10 are agents of CDHS who personally participated in the strip searches at issue in this case actively and/or by failing to intervene to stop the searches despite having the requisite knowledge and opportunity to do so.

52.     The identities of the John and Jane Doe Defendants is not currently known to Plaintiffs, nor is the information within Plaintiffs' possession or control, but is known to Defendants and within the exclusive possession and control of Defendants. Counsel for Plaintiffs have submitted public records requests to Defendant CDHS seeking information regarding the identities of all the individual Defendants, and also have repeatedly requested that counsel for Defendant CDHS identify the John and Jane Doe Defendants, but as of the filing of this Complaint, have not been provided with such information. Defendant CDHS has instead expressly refused to identify any of the John and Jane Doe Defendants despite being in exclusive possession of this material information. Upon receipt of information sufficient to identify these personnel, Plaintiffs shall seek leave to amend this complaint to specifically identify these Defendants.

53.     Defendants are sometimes referred to collectively in this Complaint as "CDHS agents," "WRRC agents," "WRRC staff," "CDHS staff," "CDHS personnel," and "WRRC personnel."

## IV.     FACTUAL ALLEGATIONS

### A.     Summary Of The Strip Searches And Involved Defendant CDHS Agents: No Exigency, No Warrant, No Informed Consent, And No Other Legal Justification

54.     On March 25-26, 2015, Defendant CDHS agents from Wheat Ridge Regional Center ("WRRC")[1] entered the ten group homes and single day habilitation program site that comprise the Pueblo Regional Center, and performed strip searches[2] of all or most of the 62 people with disabilities served by PRC.

55.     Defendants' head-to-toe strip searches of PRC residents (including Plaintiffs) included sustained hands-on contact with and manipulation of their genitals and other particularly private areas, such as their bare buttocks' and bare breasts.

56.     By their own admission to independent investigators, neither the Defendant WRRC agents nor their Defendant CDHS supervisors so much as attempted to procure a warrant or to obtain the informed consent of the PRC residents or their legal guardians before performing these invasive searches.

57.     Defendant CDHS and its agents provided PRC staff with little to no detail as to why the nonconsensual, warrantless searches were occurring, and deliberately disregarded the efforts of concerned PRC staff and the residents themselves to stop the illegal searches.

---

[1] These Defendants are sometimes referred to herein as "Defendant WRRC agents."

[2] Spokespeople for Defendant CDHS have and continue to refer to the nonconsensual strip searches using inaccurate, misleading, euphemistic terms like "body inspections," "body audits," and "skin audits".

13

58.     These nonconsensual searches were conducted at the behest of (at least) Division Director for Regional Center Operations Defendant Tracy Myszak (who was present at PRC during the searches), Defendant Myszak's supervisor, Defendant Viki Manley (CDHS Director of Community Access and Independence), her Deputy Director, Defendant Sarah Aurich, Defendant Nikki Hatch (Deputy Executive Director of Operations), and CDHS Executive Director, Defendant Reggie Bicha (collectively referred to at times as "supervisory Defendants"). All these Defendants personally participated in the searches and thereby caused them to happen by directly ordering the searches, ratifying the searches ahead of time despite being fully aware of the purported factual bases (and thus lack of legal support) for them, and/or promulgating deficient policies.

59.     The deficient policies created and/or maintained by the supervisory Defendants include but are not limited to a lack of sufficient training and supervision for DHS staff regarding the circumstances when obtaining informed consent to conduct physical searches of residents at DHS facilities is necessary, and the proper method of obtaining informed, legally-valid consent.

60.     The supervisory Defendants were all deliberately indifferent to the need to protect the legal rights of PRC residents and their family members, including all Plaintiffs.

61.     Also personally participating in the searches, either actively and/or by failing to intervene despite having the opportunity and requisite knowledge to do so, were WRRC agents Defendants Laura Devries, Jennifer Burke, Michelle Ohnemus, Marit Meland, Isaac Lawal, Sarah Lippe, Kristie Paluch, Carla Juarez, and John and Jane Does 1-10, along with Emergency Manager Defendant Gheradini. All of these Defendants were present at PRC when at least some of the strip searches occurred. All Plaintiffs who were PRC residents at the time were subjected to the strip searches caused by Defendants.

62. When interviewed by the CDPHE about the searches in April 2015, as part of CDPHE's investigation into the incident, Defendant Director Myszak told CDPHE investigators that she and her staff failed to reach out to any legal guardians before the searches due to an "immediacy to act."

63. When asked, Defendant Director Myszak was unable to provide the CDPHE investigators with a *single example* of recently reported abuse that would create such an immediate need to strip search the PRC residents.

64. In reality, there was no exigency or other circumstance that justified Defendants' failure to obtain informed consent before strip searching the PRC residents.

65. According to CDPHE's June 2015 report:

When asked for the specific catalyst for the body inspections, she [Defendant Director Myszak] generally described or alluded to events such as an incident of paranormal activity; this included words appearing on a resident's skin and "just abusive things happening." Note that the "paranormal" activity was reported to the Department of Public Health, the Pueblo Sheriff's Department and Adult Protective Services when it occurred in **November 2014**.[3] According to the occurrence report from the PRC, no charges were filed and staff had been disciplined. Moreover, she stated while she did not have a list of specifics, her concerns were more anecdotal in nature and discussed an overarching mistrust of internal and external systems involving investigations of MANE [mistreatment, abuse, exploitation, and neglect].

\*\*\*

Throughout the interview, the Director of Regional Center Operations (DRCO) could not specifically address why the Department of Human Services (DHS) felt it was necessary to conduct body inspections without defining scope, such as alleged staff involved, homes, or affected residents served, in which to focus their investigations. The Director of Regional Center Operations was specifically asked, "How did you decide to look at everyone? . . . She would not, or could not, directly answer the question or provide specific allegations of MANE meriting a body inspection for all 62 residents served. She provided no examples of one or more predators having access to, and inappropriate contact with, all ten residential settings and day program, which are separated by geographical location.

___

[3] Emphasis added from original. Defendant CDHS and its Defendant agents learned of this alleged incident by no later than February 2015.

15

66. Likewise, Defendant WRRC staff interviewed by CDPHE could not identify *any justification* that merited the nonconsensual full invasive bodily searches of as many as 62 people at each of ten individual group homes and one day habilitation site.

67. Even if there were exigent circumstances to search one or a handful of PRC residents at one or a few group homes (in actuality, there were no such circumstances), there was no exigency that would have justified strip searching nearly as many PRC residents as were searched – who resided in almost a dozen separate group homes. The scope of the searches was unreasonably and excessively broad.

68. Thus, the searches were not justified at their inception, and were not reasonably related in scope to the circumstances underlying their inception in the first place. There was no reasonable, or even arguably reasonable, justification for the grossly intrusive and coercive manner in which the searches were conducted, or their extremely sweeping breadth.

69. In addition, Defendant Director Myszak admitted to CDPHE investigators that Defendant CDHS failed to contact the residents' legal guardians prior to the strip searches, and that the Defendant WRRC agents were instead directed to "obtain [PRC] staff permission for people who were non-verbal."

70. Of course, PRC staff do not have the legal authority to give consent on behalf of PRC residents – a fact that the Director of Regional Center Operations knew at the time.[4]

71. Similarly, Defendant WRRC agents who conducted the searches deliberately made no effort to obtain legal consent before searching the PRC residents.

---

[4] Approximately forty of the PRC residents had previously been adjudicated incompetent to make decisions regarding their own health, care, and welfare and had legal guardians appointed by the court.

72.     One of the Defendant WRRC agents interviewed by the CDPHE admitted that "[n]one of the guardians were made aware that I know of."

73.     CDHS Director Defendant Bicha also admitted as much in a June 3, 2015 Denver Post article, stating: "In hindsight, I wish we had stopped and picked up the phone to call the guardians."

74.     Indeed, neither the Defendant CDHS leadership nor the Defendant WRRC team (or any other Defendant) made any effort to obtain informed consent before strip searching the PRC residents. This occurred in spite of the fact that legal guardians for some of the Plaintiffs were <u>on-site at PRC</u> when Defendants made the decisions to strip search their wards without first obtaining valid consent. C.S. even saw Defendant Myszak at PRC while the searches were occurring and asked Myszak why no one had tried to obtain consent first, and Defendant Myszak brazenly replied that CDHS did not need consent.

75.     Defendant CDHS leadership and the Defendant WRRC team could have quickly and easily asked all the other legal guardians for consent as well. CDHS has an organized, readily-accessible database that identifies the legal guardian(s) for each PRC resident who has a guardian, which includes contact information for the guardians. PRC staff routinely contact legal guardians to request permission for far more benign tasks than strip searches, such as taking residents out on a single-day trip.

76.     The decisions of Defendant CDHS leadership and the Defendant WRRC team *not* to seek appropriate consent before performing the strip searches had nothing to do with genuine or factually-based concerns that requesting permission would somehow compromise the integrity of the searches or potential evidence they uncovered. Defendant CDHS leadership and the Defendant WRRC team had no reasonable basis at the time to believe that any the legal guardian

of any PRC resident had perpetrated an act of abuse or was conspiring with any suspected abuser.

77.     Moreover, several PRC staff members who were present strongly objected to the strip searches, explaining that they were wholly unnecessary, would be traumatic to the searched residents and, at a bare minimum, required valid consent.

78.     Some members of PRC staff were genuinely concerned for the wellbeing of PRC residents, and disturbed and upset by the involved Defendants' insistence on immediately conducting strip searches en masse.

79.     However, the Defendant CDHS personnel involved in the searches affirmatively sought to silence all such protests – and evade accountability for their wrongdoing – by attempting to conduct as many of the strip searches as possible at times and in places where there were no witnesses present besides the disabled individuals being searched and other Defendants.

80.     The Defendant CDHS personnel even went so far as to command PRC staff to stop observing the strip searches. This had nothing to do with genuine or well-founded suspicions that those PRC employees had perpetrated any acts of abuse. Rather, Defendants did so as part of their contemporaneous conspiracy to cover up their violations of clearly established law.

81.     Defendant CDHS, including top leadership at the agency, has continued to conspire to hide evidence of its wrongdoing by intimidating and retaliating against those who have condemned the strip searches and refusing to provide information to which the Plaintiffs and the public are entitled.

82.     Defendant CDHS has fired a number of longtime, well-regarded PRC staff members who objected to the searches at the time or criticized the searches after they occurred

18

because these staff members opposed Defendant CDHS's illegal conduct and sought to protect the dignity and legal rights of PRC residents and their legal guardians.

**B. Defendants Failed To Ensure That PRC Residents Understood Why They Were Being Compelled To Strip Naked And (In Many Cases) Submit To Hands-On Genital Contact, Failed To Inform Residents That They Could Refuse To Be Searched, And Continued To Search Residents Who Said "No."**

83. None of the members of the so-called "body inspection team" provided Plaintiffs and the other residents with full information regarding the scope of what each resident was going to be asked to do. This foreseeably compounded the trauma and confusion caused by the illegal strip searches and unwanted and intrusive physical contact.

84. Adding further insult to injury, many residents did not understand and were never told that they had the right to decline to be searched.

85. Disability Law Colorado ("DLC"), an independent, public interest nonprofit organization, interviewed six verbal PRC residents about the searches after receiving complaints from several residents' guardians in the months following the strip searches. DLC's report notes that at least four of the six residents interviewed expressed that they were told they had no choice but to submit to being strip searched.

86. PRC's Psychologist/Program Services Director explained to CDPHE investigators that, because of their disabilities and histories, some of the residents would likely feel uncomfortable or unable to refuse when told to participate in the strip searches.

87. Indeed, the inability of many of the residents to comprehend what was about to be done to them, along with their confusion or discomfort concerning their rights to decline the searches, underscores the very reason that the law required Defendants to gain consent from these residents' guardians before the searches, and Defendants CDHS personnel's dereliction of their clearly established legal and moral duties in failing to do so.

88.     Even if the residents with intellectual and developmental disabilities and, in some cases, nonverbal PRC residents had been legally capable of providing consent (they were not), or if the PRC staff had been able to legally provide consent on the behalf of PRC residents (they could not), interviews of PRC staff and residents show that many residents vociferously objected to being searched, and reacted with obvious distress to the unwelcome and invasive physical contact.

89.     For example, a PRC staff member, identified as Staff #8 in the CDPHE investigation, related the following account of the strip search of a male resident, identified as Resident #20 who very clearly did not consent to the search:

> [Resident #20] was not receptive to [the search] at all. He was afraid, very afraid, he was shaking and he was saying No… [Resident 20] was batting them away the whole time. They took his [incontinent product] off and that was very frightening for him because the male staff that was examining him was basically moving his penis around, not basically, did move his penis around and his testicles and he did not like that. He was fearful; you could tell he was fearful.

90.     A PRC staff member described another male resident's manifest discomfort as follows:

> Staff #11 stated the body inspection for resident #18 consisted of the RN examining resident #18's eyes, ears, nose, chest, legs, genitalia and buttocks. Staff #11 stated during the body inspection, resident #18 was grimacing and moaning and that was how he showed he was uncomfortable. Staff #11 stated resident #18 was normally smiling and laughing. She stated resident #18 was so tense and contracted the RN could barely get his hand open to check his palm.

91.     Further illustrating that Defendants performed the searches even in the face of explicit statements of non-consent, four of the six verbal PRC residents interviewed during the DLC investigation stated that they told the Defendant WRRC agents that they wanted the strip searches to stop, but these Defendants proceeded with the searches, regardless of residents' express non-consent.

92.     In a separate interview conducted with the guardian of two residents identified as Residents #7 and #9, the guardian told CDPHE investigators that Residents #7 and #9 "did not want to have the body inspections 'but were told they had to.'"

93.     As the above examples of Resident #20 and Resident #18 demonstrate, the strip searches were not merely a product of procedural laziness or negligence, but rather Defendants' overt and intentional decision to flout the law.

94.     It was apparent at the time that many PRC residents (including Plaintiffs) refused to consent to the strip searches and hands-on genital contact, and were absolutely terrified, but the involved Defendant CDHS personnel still forged ahead with the head-to-toe strip searches and intimate physical manipulation and touching despite lacking any even arguably reasonable legal basis for doing so.

95.     Every involved CDHS Defendant personally participated in a number of the strip searches by going hands-on with the PRC residents despite lacking consent (or any arguably reasonable basis for not obtaining consent). Every involved CDHS Defendant *also* personally participated in a number of the strip searches by observing their co-Defendants going hands-on with the PRC residents despite lacking consent (or any arguably reasonable basis for not obtaining consent), and failing to intervene to stop these invasive strip searches despite having the opportunity to do so and requisite knowledge to conclude that the searches were in violation of clearly established law.

C.   **Further Evidence Of Defendants' Total Disregard For Plaintiff PRC Residents' Privacy And Well-Being**

96.     Supplying even more evidence of Defendant CDHS personnel's disdain for Plaintiff PRC residents' privacy and dignity (as well as their legal rights), Defendant Director Myszak initially attempted to use a group shower room for the strip searches, but the PRC

21

Executive Director (Valita Speedie) objected, stating, "I think that is abusive, it is like being molested in a public bathroom. They will be scared enough having total strangers look at their bodies."

97.     Only because of this exceedingly basic demonstration of respect were at least some of the strip searches conducted in less public (though not necessarily private) settings.

98.     Director of Community Access and Independence Defendant Manley was also present at PRC while the strip searches occurred and personally participated in the searches by, among other things, exercising supervisory authority over the other Defendant CDHS staff present, directing her subordinate Defendants to conduct the illegal searches, and affirmatively seeking to keep on-site PRC staff from witnessing or attempting to stop the illegal searches, including Executive Director Speedie.

99.     In many cases, the strip searches were performed by groups of multiple Defendants of both sexes, without regard to the privacy or emotional health of the Plaintiff residents.

100.    A PRC staff member related the following to CDPHE investigators:

Staff #8 stated the next resident the team wanted to inspect was resident #21. Resident #21 was in a rocker recliner at the time of the examination by the team inspection. Staff #8 stated there were "way too many people in there; it was very disruptive to the whole group." Staff #8 stated resident #21 was laying on her back in the recliner and the inspection team lifted her blouse up, she did not have on a bra. They checked her chest and back. The team pulled down the resident's pants to below the knees and looked at her legs.

101.    The Defendant CDHS personnel involved in the planning and execution of the strip searches also made shamefully little effort to minimize and mitigate the harmful impact of the searches on PRC residents. Numerous witnesses have spoken to the extraordinary level of

disruption caused by the strip searches and to the negative effects that have resulted from such disruptions. In the words of PRC Staff #8:

> I've been employed here for almost 28 years and when they came in, they came in like gangbusters. I was literally told, I was toileting someone and we were coming out of the bathroom, and I was told by kind of an indirect supervisor, they are going to come in and they are going to do full body inspections. I said, oh, okay and literally walked into the room, they were all in there, and they all came in like a big herd of cattle and just started going at it. I mean it was, it was very disruptive. I can imagine what the guys felt like, 'cause it was upsetting to me and I wasn't the one being examined.

102. The PRC Executive Director at the time of the strip searches, Valita Speedie, told CDPHE investigators that PRC staff had come to her "very upset" about the searches, and related that staff "felt the dignity of the residents had been violated."

103. The PRC Psychologist/Program Services Director ("PSD") indicated that he was not even informed that the strip searches would be occurring until March 26, the second day of searches. The PSD also noted his concern that personnel familiar to the PRC residents were not involved in the searches.

**D. Independent External Reviews Have Unequivocally Condemned The Nonconsensual Strip Searches.**

104. Based on record review, staff interviews, guardian interviews, and interviews of PRC residents, the CDPHE concluded in June 2015 that Defendants performed the searches with "total disregard of individual rights including privacy, dignity and respect":

> In summary, body inspections were conducted by state personnel under the express direction of the Department of Human Service (DHS) officials. DHS provided no regulation, policy or procedure that allowed for the widespread inspection of all residents' bodies. There was no evidence of specific allegations of physical or sexual abuse across eleven different settings separated by geographical location. Moreover, there was no provision in the directions given by DHS to ensure individuals were informed of the scope of the inspections and given opportunity to provide consent prior to implementation of the inspections. For the 40 individuals who were unable to provide consent, guardians were not notified nor consulted as required by regulation and PRC policy. Although the interview with the Director

23

of Regional Center Operations stated notifications of guardians were not made due to the "immediacy to act", no evidence of the need to act with immediacy was ever established. There was no evidence to support the DHS' actions which resulted in disregard of individual rights including privacy, dignity and respect. These actions resulted in individuals being scared and confused and some remained agitated days after the inspections took place.

***

Colorado Department of Public Health and Environment (CDPHE) records showed that there were no occurrence reports submitted by the DHS on behalf of the PRC in regard to allegations of abuse or mistreatment that led to the systemwide body inspections as required. No initial occurrences were submitted either prior to the DHS entering the PRC, or thereafter specific to the catalyst for the body inspections.

***

The DHS' failure to protect the rights of individuals while it investigated allegations of abuse and neglect led to residents who did not want to participate in the body inspection feeling they had no choice. Nonverbal residents' behaviors indicated they, too, did not want to participate in the body inspections; yet, the inspections were conducted in spite of the residents' protests. Ultimately, the body inspections resulted in the residents being confused, scared, and some were distraught to the point it negatively affected their behavior. [5]

105.   Likewise, Disability Law Colorado ("DLC") has condemned the strip searches:

It was a violation of policy[6] and law to then institute unclothed examinations of *all* residents of PRC, including those who were not involved in specific reports of possible abuse/neglect. It was improper to use the vulnerability of these residents to search for evidence of other abuse/neglect, and in so doing, subject all the residents to additional trauma and violations of their persons and rights.

---

[5] This quote comes from several different pages of the CDPHE's report. Other similar and consistent verbiage from the report has been omitted herein for brevity's sake.

[6] In the event of an allegation of abuse or mistreatment, both the Code of Colorado Regulations and PRC policy require that the legal guardians of the alleged victims be contacted in a timely manner.

106.     The U.S. Department of Health and Human Services, Centers for Medicare and

Medicaid Services ("CMS"), likewise found that the strip searches were illegal in an August 17,

2016 report:

> CMS has determined that body audits conducted by CDHS were not in compliance
> with the approved waiver and federal regulations §441.301(c) (2) (vi) and (xiii) (A-
> H), and §441.301(c) (4) (iii-v). According to the, "CDPHE Deficiency List," dated
> May 11, 2015, CDHS conducted unclothed body audits that sometimes included
> inspections of genitals, of all of the 62 residents at PRC without client or guardian
> consent. This action was taken without regard to residents' assessed needs or ability
> to consent and deprived them of their right to privacy, dignity and respect, and
> freedom from coercion and restraint.

107.     That CMS report also strongly rebuked Defendant CDHS's recent efforts to

coerce PRC residents' legal guardians into signing blanket consents after March 2015 searches:

> Requiring blanket consent restricts individual rights and is inconsistent with person
> centered planning and informed consent. During the CMS interviews with
> guardians of residents at PRC, CMS was informed that PRC administration is
> requiring individuals and guardians to sign blanket consents. The consents are for
> things like psychotropic medication, restraints and body audits. Consents should be
> based upon individual's needs and preferences and afford participants due process.

**E.   Witnesses and Independent External Reviews Have Found That Plaintiff PRC
Residents Were Traumatized By Defendants' Illegal Strip Searches.**

108.     Reports by both the Disability Law Colorado and the Colorado Department of

Public Health and Environment found that PRC residents were traumatized by these

nonconsensual strip searches.  For example, Resident #20, as identified in the CDPHE

investigation and discussed above, was subject to a non-consensual strip search by Defendant

WRRC agents despite his verbal attempts to express his unhappiness with the search and his

physical efforts to bat away the Defendant WRRC personnel. Resident #20 was among the many

PRC residents subjected to hands-on genital contact in the course of the searches; as the PRC

staff member identified as Staff #8 stated, Resident #20 "was batting them away the whole time.

They took his [incontinent product] off and that was very frightening for him because the male

25

staff that was examining him basically was moving his penis around, not basically, did move his penis around and his testicles and he did not like that. He was fearful; you could tell he was fearful." Staff #8 further noted that the negative effects of the strip search endured well beyond the search itself: "[Resident #20] has been agitated since then. He has wanted to strike out. He is not a happy camper."

109.     During CDPHE's interview of PRC Executive Director Valita Speedie, Ms. Speedie indicated that Resident #10 had come to see her on the morning of April 1, 2015 – several days after the strip searches occurred – and that the resident was still "very upset" about the strip searches.

110.     Ms. Speedie further stated that other individuals were affected by the searches and particularly noted that Resident #6 and Resident #7 had become physically aggressive, most likely as a result of the stress generated by the strip searches. Police and Adult Protective Services were called, and Resident #6 was ultimately transported to the hospital for a mental health evaluation and did not return to PRC until the next day, further adding to the disruption and trauma suffered by Resident #6.

111.     Ms. Speedie also avers in a sworn statement:

Based on my observations, DHS has falsely insisted that it did no wrong even though the strip searches were nonconsensual, there was no emergency which could have justified them, the strip searches further traumatized people who are generally helpless and overlooked by society, and there has been no accountability for them. These searches even traumatized PRC's employees and made their jobs much more difficult because the residents' trust in people in general was gone after those searches.

112.     PRC's Psychologist/Program Services Director ("PSD") expounded at some length on the harm that the strip searches posed to PRC residents in his interview with CDPHE investigators. The PSD noted that he had worked with numerous residents at PRC who had

suffered past sexual trauma, some of whom had been diagnosed with Post-Traumatic Stress

Disorder. The PSD stated:

> I think if even a familiar staff had to do it [the body inspection] there is a possibility
> for retraumatization for some of those individuals. Yes. And in fact, one of the
> homes that I probably have the greatest concern about would be with individuals
> with borderline personality disorder in their diagnoses; and many individuals with
> borderline personality disorder often have had early trauma experiences. And I
> know many individuals have.

### F. Defendant CDHS Leadership's Steadfast Refusal To Take Responsibility For Their Wrongdoing

113.    Incredibly, even after the CDPHE unequivocally determined that Defendant

CDHS personnel had violated the PRC residents' rights, Defendant CDHS leadership continued

to deny any wrongdoing, and even went so far as to assert that Defendant CDHS personnel did

not need to obtain the consent of the PRC residents or their legal guardians to perform the mass

strip searches.

114.    Defendant CDHS leadership has continued to refuse to accept any responsibility

despite failing to identify evidence showing that CDHS had received a report of widespread

abuse occurring at PRC during the days or even weeks before conducting the strip searches that

would have justified the invasive, nonconsensual strip searches of all the PRC residents across

ten separate group homes. As such, there appears to be no evidence to supply even arguable

cause for CDHS's failure to seek – much less acquire – prior consent to the strip searches.

115.    As a result of Defendant CDHS leadership's ongoing unwillingness to even

acknowledge Defendants' wrongdoing or affirm the importance of consent, Disability Law

Colorado recommended that the Plans of Correction submitted by CDPHE be strengthened with

additional outside monitoring rather than allow Defendant CDHS to self-monitor.

116.    In defending its bizarre stance that Defendant CDHS personnel did not need informed consent to strip search the PRC residents, Defendant CDHS stated in response to the CDPHE's report,

> The right to written, informed consent applies to certain unusual forms of care and treatment that are invasive, surgical, or irreversible; it does not require prior guardian consent or a signed consent form for each and every routine caregiving act.

This assertion is false and does not comport with the law.

117.    The assertion of Defendant CDHS leadership that mass nonconsensual strip searches (including hands-on genital contact) of disabled adults at PRC are routine is belied by the fact that, according to the Colorado Department of Health Care Policy and Financing, "comprehensive unclothed physical assessments" are outside the scope of services provided in residential or day habilitation services.

118.    Further, even if mass strip searches were part of the typical regimen of care for residents at PRC, this would not deprive the residents and their guardians of their legal rights to make decisions about the residents' medical care. As DLC's report states:

> CDHS failed to implement and enforce policy and procedure in regards to the basic rights of all patients/individuals. This failure led to CDHS conducting body inspections system-wide of all residents at PRC without adherence to their individual rights to dignity, respect and personal privacy, along with their rights to informed consent and to make decisions about their medical care. The body inspections were unexplained to the residents.

**G.  Defendants' Illegal Conduct Caused Lasting Harm To The Plaintiffs**

119.    All of the searched PRC residents, including Plaintiffs, have experienced significant and lasting harm as a result of the strip searches, including negative emotions including but not limited to fear, anxiety, resentment, mistrust, anger, shame, and

28

embarrassment, along with behavioral changes such as trouble sleeping, changes in appetite and activity patterns, and decreased sociability.

120.    The Plaintiffs are especially vulnerable to experiencing and suffering ill effects from all types of abuse because they so heavily rely on people in positions of trust and power to navigate their daily lives, and because physical and/or verbal self-defense is difficult if not impossible for most of them.

121.    The fact that many PRC residents, including several of the Plaintiffs, had a history of abuse before the searches further compounded the damage the searches caused, and made that damage even more foreseeable.

122.    In addition, a number of PRC residents have shown signs of PTSD as a result of the strip searches. This includes several of the Plaintiffs.

123.    The searches also have exacerbated the effects of PTSD in residents who already had the condition. This includes several of the Plaintiffs.

124.    Because it is not feasible for many PRC residents (including several Plaintiffs) to communicate effectively using language, they are largely cut off from one of the most effective mechanisms for coping with trauma. This has further amplified their damages.

125.    Making the searches even more harmful, the involved Defendant CDHS staff were in positions of power, and were people that PRC residents (including Plaintiffs) repeatedly had been taught to trust and treat with deference. Defendant DHS personnel's callous violation of this trust upended the worldview of many PRC residents (including Plaintiffs) – and their faith in a system that is supposed to care for and protect them.

126. The full extent of PRC residents' damages (including Plaintiffs) still may not be fully apparent. According to a psychologist at PRC, trauma might not manifest itself immediately and could take months to emerge.

127. Nonetheless, it is abundantly clear that the strip searches were terribly distressing to the victims and their caregivers (including Plaintiffs) for many reasons, including their gratuitously invasive, non-private nature, the fact that they were conducted even when the victims communicated that they did not consent, the fact that many of the victims are particularly vulnerable because of their histories of sexual and physical abuse, and the fact that all of the victims have disabilities that make it particularly difficult for them to cope with and overcome trauma.

128. It was wholly foreseeable to the involved Defendants that subjecting PRC residents (including Plaintiffs) to involuntary strip searches would cause them serious and lasting harm. This is true not only because all the Defendants knew at the time that many PRC residents (including several Plaintiffs) had histories of physical and sexual trauma, and disabilities that compromised their ability to understand why they were being forcibly strip searched and to cope with additional trauma, but also because all the involved Defendants were trained and experienced social workers. All the involved Defendants were, therefore, trained (albeit deficiently by Defendant CDHS) to work with this particular population, regularly worked with this population, were familiar with the vulnerabilities unique to this population, and thus were well aware of the severe harm that they were inflicting as they inflicted the harm. This failed to give them pause, however, and instead emboldened the involved Defendants because they knew how relatively defenseless PRC residents were and believed they could evade accountability for illegally strip searching them as a result.

129.     Some Plaintiffs still reside at PRC. In light of Defendant CDHS's refusal to
apologize for the strip searches, much less take meaningful remedial action in response to them,
those Plaintiffs face a grave and credible threat that they will be illegally strip searched again at
the behest of Defendant CDHS and the other Defendants still employed by the State. Thus,
prospective injunctive relief designed to prevent similar illegal searches in the future is an
available and appropriate remedy in this case.

## V.     STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment Violation –
### Unlawful Search and Seizure
### (Against All Defendants)

130.     Plaintiffs hereby incorporates all other paragraphs of this Complaint as if fully set
forth herein.

131.     Defendants were acting under color of state law in their actions and inactions that
occurred at all times relevant to this action.

132.     No Defendant at any time relevant to this Complaint had probable cause or
reasonable suspicion, or any other legally valid basis, to believe that any Plaintiff committed or
was committing any violation of the law prior to seizing, searching, and continuing to restrain
their person.

133.     No Defendant at any time relevant to this Complaint had a reasonable basis for
believing that any Plaintiff had recently been harmed by an abuser.

134.     No Defendant at any time relevant to this Complaint had a reasonable basis for
believing that an exigent or emergency circumstance justified searching or seizing any Plaintiff.

135.     No Defendant at any time relevant to this Complaint had a warrant authorizing
any such search or seizure of any Plaintiff's body.

136.     No Defendant at any time relevant to this Complaint had valid consent authorizing any such search or seizure of any Plaintiff's body.

137.     Defendants were aware that no one had obtained valid legal consent authorizing any such search or seizure of any Plaintiff's body.

138.     No special needs exception applied to Defendants' strip searches and, even assuming, *arguendo*, that this rule applied, the searches were still unreasonable and unlawful because they were not justified at their inception, and their scope and degree of intrusiveness were grossly excessive under the circumstances.

139.     Yet, Defendants, acting in concert with one another, forcibly seized and searched each Plaintiff despite lacking any legally valid basis for their actions.

140.     During this seizure, Defendants forcibly and intentionally restrained each Plaintiff against their will, despite lacking any legally valid basis for their actions.

141.     Each of the involved Defendants failed to intervene to prevent the other Defendants from violating Plaintiffs' constitutional rights by unlawfully seizing and searching them – despite having the opportunity to intervene – and are thereby liable for such failure to intervene.

142.     Defendants' actions (and inaction) were objectively unreasonable in light of the circumstances confronting them, and violated clearly established law of which reasonable officials in their positions would have known.

143.     Defendants engaged in these actions (and inaction) intentionally, willfully, and wantonly, demonstrating deliberate indifference to the constitutionally-protected rights of Plaintiffs, and demonstrating a reckless disregard for Plaintiffs' federally-protected constitutional rights.

144.    Before and after March 2015, Defendants CDHS, Myszak, Manley, and Bicha failed to properly train, supervise, and discipline their employees/subordinates regarding the constitutional and statutory rights of disabled persons and their families and guardians, including but not limited to the legal bases for physically seizing and searching individuals housed at CDHS facilities, circumstances when prior consent to such searches and seizures are required, and proper methods of obtaining prior consent.

145.    This inadequate training, supervision, and discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to these Defendants.

146.    In light of the duties and responsibilities of personnel of Defendants CDHS, Myszak, Manley, and Bicha – who must make decisions regarding when searches and seizures of individuals are appropriate and what consent must be obtained – the need for scrutiny in specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of appropriate training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that Defendants CDHS, Myszak, Manley, and Bicha are liable for their failure to properly train, supervise, and/or discipline their subordinate employees and agents.

147.    Defendants Myszak, Manley, and Bicha personally participated in such failure to properly train, supervise, and discipline.

148.    Such failure to properly train, supervise, and discipline was the moving force behind and proximate cause of Defendants' illegal searches and seizures of each Plaintiff, and constitutes an unconstitutional policy, procedure, custom, and practice.

149.    Each Plaintiff has been and continues to be damaged by Defendants' wrongful

searches and seizures of them.

150.    The acts or omissions of each Defendant described herein, including the

unconstitutional policy, procedure, custom and/or practice described herein, were the legal and

proximate cause of Plaintiffs' damages.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 12132, *et seq.* – Violation of Americans with Disabilities Act of 1990, as Amended
### Unlawful Discrimination and Failure to Reasonably Accommodate
### (Against Defendants CDHS and Hickenlooper)

151.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

152.    At all relevant times, each Plaintiff was a person with a disability, had a record of

a disability, or was regarded as having a disability by Defendants.

153.    The Colorado Department of Human Services and Pueblo Regional Center are

public entities as that term is used in Title II of the ADA.

154.    Each Plaintiff was qualified to participate in the services, programs, activities, and

benefits provided to residents of Pueblo Regional Center within the meaning of Title II of the

ADA.

155.    Defendants intentionally discriminated against each Plaintiff based on their

disabilities and intentionally failed to reasonably accommodate their disabilities despite knowing

that each Plaintiff had significant mental and physical impairments that substantially limited a

variety of major life activities, such as mentally processing current events, thinking, physically

caring for themselves, cognition, and effectively coping with trauma, anxiety, and stress.

Examples of this wrongdoing include but are not limited to Defendants' mandatory

34

nonconsensual strip searches of each Plaintiff, and Defendants' refusal to reasonably accommodate each Plaintiff's disabilities by, among other things, obtaining appropriate consent before searching each Plaintiff, and communicating with each Plaintiff in a manner that was comprehensible to them and afforded them with an adequate opportunity to understand the basis for, and refuse consent to, being strip searched.

156.    Defendants and other CDHS personnel have engaged in substantially similar discriminatory conduct against other mentally-disabled individuals who are or have been in the custody of the State of Colorado.

157.    Defendants' conduct violated clearly established law under Title II of the ADA and its implementing regulations.

158.    Defendants had no legitimate basis for violating each Plaintiff's rights conferred by the ADA.

159.    Defendants' actions (and inactions) were objectively unreasonable in light of the circumstances confronting them.

160.    Defendants engaged in these actions intentionally, willfully, and wantonly.

161.    The institutional/supervisory Defendants failed (and continue to fail) to properly train, supervise and/or discipline their employees regarding the proper treatment of, and accommodations for, individuals with disabilities and, in particular, mental disabilities.

162.    This inadequate training, supervision, and/or discipline results from a conscious or deliberate choice to follow a course of action from among various alternatives available to the institutional/supervisory Defendants.

163.    In light of the duties and responsibilities of the institutional/supervisory Defendants (who must make decisions regarding when searches and seizures of individuals are

appropriate and what consent must be obtained), the need for specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of appropriate training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that the institutional/supervisory Defendants are liable for their failure to properly train, supervise, and/or discipline their subordinate employees and agents.

164.    Such failure to properly train and supervise was the moving force behind and proximate cause of the violations of Plaintiffs' federally-protected rights described herein, and constitutes an unconstitutional policy, procedure, custom and/or practice.

165.    Plaintiffs have been and continue to be damaged by Defendants' unlawful conduct under the ADA.

166.    The acts or omissions of Defendants, including the unlawful policy, procedure, custom and/or practice described herein, were the legal and proximate cause of Plaintiffs' damages.

## THIRD CLAIM FOR RELIEF
### 29 U.S.C. § 701, *et seq.* – Violation of the Rehabilitation Act of 1973, as Amended
### Unlawful Discrimination
### (Against Defendant CDHS and Hickenlooper)

167.    Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein.

168.    At all times relevant to this Complaint, Plaintiffs' mental and physical impairments substantially limited a variety of major life activities, including but not limited to mentally processing current events, thinking, physically caring for themselves, cognition, and effectively coping with trauma, anxiety, and stress.

36

169.     Each Plaintiff is an individual with a disability within the meaning of the Rehabilitation Act of 1973.

170.     Each Plaintiff was qualified to participate in the services, programs, activities, and benefits provided to residents at Defendant CDHS's facilities within the meaning of the Rehabilitation Act of 1973.

171.     Defendants and their programs and activities receive – and have received at all times relevant to this Complaint – federal financial assistance as that term is used in 29 U.S.C. § 794.

172.     Defendants have intentionally excluded Plaintiffs from participation in, intentionally denied them the benefits of, and/or intentionally subjected them to discrimination in programs and activities solely by reason of their disabilities in violation of 29 U.S.C. § 794 and its implementing regulations. Examples of this wrongdoing include but are not limited to Defendants' mandatory nonconsensual strip searches of each Plaintiff who resided at PRC, and Defendants' refusal to reasonably accommodate each of these Plaintiff's disabilities by, among other things, obtaining appropriate consent before searching each Plaintiff, and communicating with each Plaintiff in a manner that was comprehensible to them and afforded them with an adequate opportunity to understand the basis for, and refuse consent to, being strip searched. Plaintiffs had a legal right to grant or withhold consent to the strip searches without undue duress and to be fully informed before making this important decision regarding their privacy and personal autonomy, but Defendants intentionally denied Plaintiffs (and excluded them from exercising) this basic right because of their disabilities.

173.     Defendants illegally, severely, and/or pervasively harassed, abused, and discriminated against each Plaintiff because of their disabilities.

37

174.     The institutional/supervisory Defendants are liable for the acts and/or omissions of their agents and employees. Defendants, either directly or by and through agents, discriminated against each Plaintiff on the basis of their disability, record of having a disability, or being perceived as having a disability.

175.     In violating Plaintiffs' rights, including those under the Rehabilitation Act, Defendants acted intentionally, maliciously, and/or with reckless and/or deliberate indifference to Plaintiffs' federally-protected rights.

176.     The institutional/supervisory Defendants failed (and continue to fail) to properly train, supervise and/or discipline their employees regarding the proper treatment of, and accommodations for, individuals with disabilities and, in particular, mental disabilities.

177.     This inadequate training, supervision, and/or discipline results from a conscious or deliberate choice to follow a course of action from among various alternatives available to the institutional/supervisory Defendants.

178.     In light of the duties and responsibilities of the institutional/supervisory Defendants (who must make decisions regarding when searches and seizures of individuals are appropriate and what consent must be obtained), the need for specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of appropriate training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that the institutional/supervisory Defendants are liable for their failure to properly train, supervise, and/or discipline their subordinate employees and agents.

179.     Such failure to properly train and supervise was the moving force behind and proximate cause of the violations of Plaintiffs' federally-protected rights described herein, and constitutes an unconstitutional policy, procedure, custom and/or practice.

180.     As a consequence of Defendants' illegal conduct, Plaintiffs have sustained and continues to sustain significant damages.

181.     Defendants' conduct was the proximate cause of Plaintiffs' injuries, damages, and losses.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment Violation –**
**Violation of Familial Right to Make Decisions Concerning the Care, Custody, and Control**
**of Wards of Family**
**(Against All Defendants)**

182.     Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein.

183.     At all relevant times, Plaintiffs W.F., J.M., B.J.M., C.S., and F.S. had a clearly established, constitutionally-protected fundamental right to make decisions concerning the care, custody, and control of their wards, including Plaintiffs M.F., K.M., and J.S. This clearly established right included the prerogative to consent – or not consent – to the strip searches at issue.

184.     Defendants' obligation to comply with this clearly established right was particularly acute as their nonconsensual strip searches of the resident Plaintiffs included hands-on genital contact and manipulation.

185.     This right was protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

186.     Plaintiffs W.F.'s, J.M.'s, B.J.M.'s, C.S.'s, and F.S.'s liberty interest encompassed their right to consent – or not consent – to the strip searches at issue herein.

187.     Defendants violated Plaintiffs W.F.'s, J.M.'s, B.J.M.'s, C.S.'s, and F.S.'s fundamental liberty interest by strip searching (including nonconsensual hands-on genital contact

and manipulation) their Plaintiff-wards without obtaining, or even seeking to obtain, any Plaintiff's consent, and despite lacking probable cause or reasonable suspicion, or any other legally valid basis to conduct nonconsensual searches.

188.    The procedures the involved Defendants employed before violating the involved Plaintiffs' rights were woefully and unlawfully inadequate. As discussed, there was not an even arguably valid basis for the involved Defendants to fail to even *try* to contact Plaintiffs W.F., J.M., B.J.M., C.S., or F.S. before forcibly strip searching their wards at PRC.

189.    The involved Defendants had actual or constructive notice at the time of the contested events that Plaintiffs W.F., J.M., B.J.M., C.S., and F.S. were both the legal guardians of their wards at PRC and close family members of their wards, and could have easily and quickly contacted these Plaintiff legal guardians to request consent to the searches – but intentionally failed to do so.

190.    The involved Defendants had actual or constructive notice at the time of the contested events that Plaintiffs W.F., J.M., B.J.M., C.S., and F.S. had the legal right to make decisions concerning the care, custody, and control of their wards at PRC, and that this legal right extended to the ability to consent or not consent to the strip searches at issue.

191.    Seeking to obtain valid consent from Plaintiffs would not have presented a significant or undue burden to any Defendant at any relevant time. Any so-called government interest involved was substantially outweighed by the involved Plaintiffs' clearly-established rights to familial integrity described herein.

192.    The nonconsensual strip searches were not in the best interest of anyone, including but certainly not limited to any Plaintiff. The strip searches were profoundly damaging and harmful to all Plaintiffs.

193.     The nonconsensual strip searches grossly infringed on the involved Plaintiffs'
familial rights to make decisions concerning the care, custody, and control of their wards receive.

194.     The involved Defendants' challenged conduct shocks the judicial conscience.
This is true for myriad reasons, including the facts that they had an extended opportunity to
reflect and deliberate before engaging in the contested strip searches, that they engaged in the
contested strip searches (including hands-on genital contact and manipulation) again and again
(for a total of more than 50 times), and that the involved Defendants were well aware at the time
of the profound harm that they were inflicting on both the Plaintiffs at PRC and their Plaintiff
family members, but persisted in their illegal course of conduct nonetheless. The involved
Defendants could have quickly and easily contacted the Plaintiff family members to attempt to
obtain consent to the strip searches before performing the searches, but deliberately failed to do
so.

195.     The involved Defendants knew that forcibly strip searching the Plaintiffs at PRC
without valid consent would interfere with their intimate familial relationships with their Plaintiff
family members, and intentionally and knowingly interfered with that relationship by forcibly
and coercively strip searching the Plaintiff family members' wards, despite lacking any
reasonable basis or other even arguable legal justification for their conduct.

196.     The challenged searches severely adversely affected the Plaintiff family
members' right to direct their Plaintiff wards' medical care and the like, and severely adversely
affected the Plaintiff family members' intimate relationship with their Plaintiff wards.

197.     In addition, each of the involved Defendants failed to intervene to prevent the
other Defendants from violating Plaintiffs' constitutional rights by failing to obtain appropriate

consent – despite having the opportunity to intervene – and are thereby liable for such failure to intervene.

198.    Defendants' actions (and inaction) were objectively unreasonable in light of the circumstances confronting them, and violated clearly established law of which reasonable officials in their positions would have known.

199.    Defendants engaged in these actions (and inaction) intentionally, willfully, and wantonly, demonstrating deliberate indifference to the constitutionally- protected rights of Plaintiffs, and demonstrating a reckless disregard for Plaintiffs' federally-protected constitutional rights.

200.    Before and after March 2015, Defendants CDHS, Myszak, Manley, and Bicha failed to properly train, supervise, and discipline their employees/subordinates regarding the constitutional and statutory rights of disabled persons and their family members and guardians, including but not limited to the legal bases for physically seizing and searching individuals housed at CDHS facilities, circumstances when prior consent to such searches and seizures are required, and proper methods of obtaining prior consent.

201.    This inadequate training, supervision, and discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to these Defendants.

202.    In light of the duties and responsibilities of personnel of Defendants CDHS, Myszak, Manley, and Bicha – who must make decisions regarding when searches and seizures of individuals are appropriate and what consent must be obtained – the need for scrutiny in specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of appropriate training and/or supervision is so likely to result in a violation of

constitutional rights, such as those described herein, that Defendants CDHS, Myszak, Manley, and Bicha are liable for their failure to properly train, supervise, and/or discipline their subordinate employees and agents.

203. Defendants Myszak, Manley, and Bicha personally participated in such failure to properly train, supervise, and discipline.

204. Such failure to properly train, supervise, and discipline was the moving force behind and proximate cause of Defendants' illegal searches and seizures of each Plaintiff and failure to seek or obtain consent from their legal guardians, including Plaintiffs W.F., J.M., B.J.M., C.S., and F.S., and constitutes an unconstitutional policy, procedure, custom, and practice.

205. Each Plaintiff has been and continues to be damaged by Defendants' wrongful searches and seizures and their failure to obtain legal consent in utter disregard of the rights of PRC residents' family members and guardians, including Plaintiffs W.F., J.M., B.J.M., C.S., and F.S.

206. The acts or omissions of each Defendant described herein, including the unconstitutional policy, procedure, custom and/or practice described herein, were the legal and proximate cause of Plaintiffs' damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against each of the Defendants, and award them all relief allowed by law,[7] including but not limited to the following:

(a) Appropriate relief at law and equity;

---

[7] Plaintiffs do not seek monetary damages against the State itself for violating the United States Constitution.

(b) Declaratory relief and other appropriate equitable relief, including but not limited to prospective injunctive relief designed to prevent similar illegal searches in the future, which is appropriately tailored to protect the rights of <u>both</u> the Plaintiff PRC residents <u>and</u> the Plaintiff legal guardians/family members;

(c) Economic losses on all claims as allowed by law;

(d) Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, loss of companionship and association with family members, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f) Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(g) Pre- and post-judgment interest at the appropriate lawful rate;

(h) Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 14th day of December 2016.

KILLMER, LANE & NEWMAN, LLP

*s/ Mari Newman*

_____
Mari Newman
Darold W. Killmer
Michael P. Fairhurst
1543 Champa St., Ste. 400
Denver, CO 80202
(303) 571-1000

44

(303) 571-1001 (fax)
mnewman@kln-law.com
dkillmer@kln-law.com
mfairhurst@kln-law.com

James M. Croshal
James M. Croshal Attorney at Law
201 W. 8th Street, Suite 350
Pueblo, CO 81003
(719) 545-5100
jcroshal@yahoo.com

ATTORNEYS FOR PLAINTIFFS